UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF ELIAS,<br><br>Plaintiff,<br><br>vs.<br><br>VAZRICK NAVASARTIAN, et al.,<br><br>Defendants. | 1:15-cv-01567-LJO-GSA-PC<br><br>FINDINGS AND RECOMMENDATION, RECOMMENDING THAT DEFENDANT NAVASARTIAN'S MOTION FOR SUMMARY JUDGMENT BE GRANTED (ECF No. 26.)<br><br>OBJECTIONS, IF ANY, DUE WITHIN 14 DAY |

## I.    BACKGROUND

Jeff Elias ("Plaintiff") is a state prisoner proceeding pro se in this civil rights action pursuant to 42 U.S.C. § 1983.  This case proceeds with Plaintiff's original complaint filed on October 14, 2015, against defendants Vazrick Navasartian (D.D.S.) and J. Dubiel (D.D.S.) on Plaintiff's medical claims under the Eighth Amendment and related state law claims.  (ECF No. 1.)

On December 13, 2016, Defendant Navasartian ("Defendant") filed a motion for summary judgment.  Fed. R. Civ. P. 56.  (ECF No. 26.)  On February 8, 2017, Plaintiff filed an opposition, and on February 14, 2017, Defendant filed a reply.[1]  (ECF No. 31.)  The motion has

---

[1] Concurrently with his motion for summary judgment, Defendant served Plaintiff with the requisite notice of the requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).  (ECF No. 26-1.)

been submitted upon the record without oral argument pursuant to Local Rule 230(*l*), and for the reasons that follow, Defendant's motion shall be granted.

## II.     SUMMARY OF PLAINTIFF'S ALLEGATIONS

Plaintiff is currently incarcerated in the custody of the California Department of Corrections and Rehabilitation at Pleasant Valley State Prison (PVSP) in Coalinga, California, where the events at issue allegedly occurred. Defendants Navasartian and Dubiel were dentists employed at PVSP during the relevant time. Plaintiff's allegations follow.

On May 26, 2015, Plaintiff had two teeth filled by defendant Navasartian. The fillings were too high and left Plaintiff's gums exposed. Plaintiff suffered severe pain in his gums, mouth, and head. Plaintiff submitted a written request for emergency treatment.

On June 1, 2015, Plaintiff was examined by defendant Dubiel, who said the fillings were too high. Dubiel ground down the fillings and said they still needed to be fixed, but he would not fix them. Plaintiff told Dubiel that his pain was sharp, pounding, shooting, and throbbing, and that eating and flossing made it worse. Dubiel did not prescribe any pain medication for Plaintiff.

That same day, Plaintiff submitted another request for dental care, alleging that he was in extreme pain and had been suffering from a headache for over a week. The next day, Plaintiff was seen by defendant Navasartian. Plaintiff told Navasartian about his extreme pain and that eating and drinking made the pain worse. Navasartian did not prescribe any pain medication for Plaintiff. The only treatment Navasartian provided was salt. Navasartian told Plaintiff that the complications from his dental procedure were caused by Plaintiff's failure to floss. Plaintiff said this could not be so because he has been flossing every day for years. In Plaintiff's progress report following the visit, Navasartian wrote that the cause of Plaintiff's complication was that Plaintiff aggressively used a toothpick on his teeth. Plaintiff has never used toothpicks since being incarcerated. Navasartian authored a document falsely claiming that Plaintiff refused dental treatment on that day.

///

///

The next day, June 4, 2015, Ms. Lebo, a dental assistant, called Plaintiff to the medical clinic and told him that neither Navasartian nor Dubiel wanted to see him, and therefore he would have to wait at least a week to receive treatment from another dentist.

Eight days later, on June 12, 2015, Plaintiff submitted another request for dental care stating, "It's been over 2 weeks since I had my fillings done and having (*sic*) to deal with the pain. Can I get some pain medication and have you help fix my teeth!" (ECF No. 1 at ¶35.)

## III. PLAINTIFF'S CLAIMS

On February 4, 2016, the court issued a screening order finding that Plaintiff stated an Eighth Amendment deliberate indifference claim and a state law medical negligence claim against defendants Navasartian and Dubiel.[2] (ECF No. 7.)

### A. <u>Eighth Amendment Medical Claim</u>

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)). As part of proper medical care, "the Eighth Amendment requires that prisoners be provided with a system of ready access to adequate dental care." <u>Hunt v. Dental Dep't</u>, 865 F.2d 198, 200 (9th Cir. 1989). Prison officials violate the Eighth Amendment if they are deliberately indifferent to a prisoner's serious medical needs, including dental needs. <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1253 (9th Cir. 1982).

The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." <u>Jett</u>, 439 F.3d at 1096 (quoting <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations

---

[2] On March 13, 2017, defendant Dubiel's motion to dismiss under California Civil Procedure Code § 425.13 was granted and Plaintiff's medical negligence claim for punitive damages against defendant Dubiel was dismissed. (ECF No. 34.)

3

omitted)). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." Id. at 1060. "[E]ven gross negligence is insufficient to establish a constitutional violation." Id. (citing Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990)).

**B.    Medical Negligence**

"The elements of a medical negligence claim include: '(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and resulting injury; and (4) actual loss or damage resulting from the professional's negligence.'" Lambesis v. Abiaro, No. 15CV1359-MMA (NLS), 2016 WL 1409555, at *2 (S.D. Cal. Apr. 11, 2016) (citing Avivi v. Centro Medico Urgente Medical

///

4

Center, 159 Cal.App.4th 463, 468, n.2 (2008) (internal quotations and citation omitted); Johnson v. Superior Court, 143 Cal.App.4th 297, 305 (2006).

## II.    SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he need only prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendant meets his initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo

Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The Court determines only whether there is a genuine issue for trial. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

## V.    DEFENDANT'S STATEMENT OF UNDISPUTED FACTS[3]

Plaintiff Jeff Elias (#T12953) was at all relevant times an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR), incarcerated at Pleasant Valley State Prison (PVSP) in Coalinga, California. (Compl. ¶5.)    Defendant Vazrick Navasartian is a Doctor of Dental Surgery (D.D.S.), licensed in the State of California since August 2002. He received his D.D.S. from the University of California, Los Angeles, and received a Master of Public Health from the Fielding School of Public Health at the University of California, Los Angeles.    (Decl. of Vazrick Navasartian, D.D.S. (Navasartian Decl.) at ¶1.)

Dr. Navasartian is currently employed by the CDCR, Division of Correctional Health Care Services (DCHCS), Inmate Dental Services Program (IDSP), as a dentist at Pleasant Valley State Prison (PVSP) in Coalinga, California, and has been employed in this capacity for nine years.    (Navasartian Decl. at ¶2.)    As a dentist at PVSP, Dr. Navasartian's responsibilities include providing clinical services to inmates housed at the prison, supervising auxiliary staff, ordering medications, and handling administrative work. (Navasartian Decl. at ¶3.)

Inmate Elias received a comprehensive exam and treatment plan from Dr. Navasartian on September 9, 2014.    At that time, no restorations were planned or indicated on teeth #29 and #30. (Navasartian Decl. at ¶ 5 & Ex. A; Decl. of Matthew Milnes, D.D.S. (Milnes Decl.) at ¶4 & Ex. A.)    The treatment plan for inmate Elias was updated by Dr. Navasartian on May 26, 2015, to include restorations #29DO and #30MOB (letters refer to specific surfaces of the teeth to be restored).    These restorations were diagnosed based on: (1) recurrent decay associated with existing restorations on teeth #29 and #30; and (2) fractured existing amalgam restorations on teeth #29 and #30 as documented in the treatment note dated May 26, 2015.    (Navasartian

---

[3] These are the undisputed facts as submitted by Defendant Navasartian, solely for purposes of his summary judgment motion.  Plaintiff has submitted his own statements of undisputed facts and disputed facts. (ECF No. 30 at 9-20.)

Decl. at ¶6 & Ex. B; Milnes Decl. at ¶5 & Ex. B.) On May 26, 2015, Dr. Navasartian performed restorations (fillings) on Elias' teeth #29 and #30. (Navasartian Decl. at ¶7 & Ex. B; Milnes Decl. at ¶5 & Ex. B.)

The steps that may generally be followed by a dentist when restoring a tooth include first a review of the health history, the treatment plan, X-rays, and visual inspection of the tooth to confirm restoration is necessary. A local anesthetic may be utilized, any existing restorations removed, any caries removed, a matrix and wooden wedge may be used, then filling material is placed and condensed into the preparation. Thereafter it is carved to fit the anatomy of the tooth, any excess is cleaned off, the wedge is removed, then the matrix, then any excess is removed from interproximal spaces. The occlusion (bite) is checked, interproximal contact is checked, and the patient is given post-procedure instructions. For the restorations performed on inmate Elias on May 26, 2015, Dr. Navasartian followed these steps. (Navasartian Decl. at¶ 7.)

Following the restorations, Dr. Navasartian checked for occlusion (the relationship between the maxillary (upper) and mandibular (lower) teeth when they approach each other, as occurs during chewing or at rest), and contact (an open contact is space between adjacent teeth). No defects were noted. (Navasartian Decl. at ¶7 and Ex. B; Milnes Decl. at ¶5 and Ex. B.)

Subsequently, inmate Elias presented to the dental clinic for a face-to-face triage with Dr. Dubiel on June 1, 2015, with a chief complaint of, "Where these last two fillings were done it hurts bad." Dr. Dubiel checked for occlusion with articulating paper and diagnosed an open contact between teeth #29 and #30. Dr. Dubiel also diagnosed "both fills high" in reference to the restorations placed by Dr. Navasartian on teeth #29 and #30. The "high" fillings were adjusted by Dr. Dubiel, who noted, "I/P (inmate patient) felt better." Dr. Dubiel also noted restoration #29DO will be redone at the next appointment to address the open contact between teeth #29 and #30. (Navasartian Decl. at ¶8 & Ex. C; Milnes Decl. at ¶6 & Ex. C.)

On June 3, 2015, inmate Elias presented to the dental clinic for a face-to-face triage with Dr. Navasartian. (Navasartian Decl. at ¶9 & Ex. E; Milnes Decl. at ¶7 & Ex. D.) Inmate Elias had prepared a Dental Pain Profile on that date, which Dr. Navasartian reviewed, wherein

he checked boxes that described his pain as "aching, pounding, tender, shooting, throbbing, sore, and stabbing." Inmate Elias also indicated that "eating, drinking hot/cold water," made the pain worse. (Navasartian Decl. at ¶9 & Ex. D.)  On June 3, 2015, inmate Elias reported his chief concern as, "I have really bad pain, my gum hurts," referencing teeth #29 and #30. (Navasartian Decl. at ¶10 & Ex. D; Milnes Decl. at ¶7 & Ex. D.)  Dr. Navasartian performed an examination, reviewed radiographs, and reviewed the patient summary of Plaintiff. (Navasartian Decl. at ¶10 & Ex. D.)  Dr. Navasartian diagnosed moderate localized periodontitis with a probing depth of > 6mm. (Navasartian Decl. at ¶10 & Ex. D; Milnes Decl. at ¶7 & Ex. D.)

Periodontitis is defined as inflammation of the gingiva, loss of interproximal bone, and supporting structures to the tooth extending into the adjacent attachment apparatus.  The disease is characterized by the loss of clinical attachment due to destruction of the periodontal ligament and loss of the adjacent bone support.  Clinical features may include edema, erythema, gingival bleeding on probing, and/or suppuration.  It can develop as a result of diet, poor oral hygiene, genetic predisposition, and the structure of the dentition. (Navasartian Decl. at ¶10 & Ex. D.)

Dr. Navasartian also diagnosed gingivitis.  Gingivitis is inflammation limited to the free and attached gingiva.  It may be characterized by bleeding upon probing, redness of the gum tissue, and pain.  Its causes may include poor oral hygiene and the accumulation of bacteria and plaque. (Navasartian Decl. at ¶10 & Ex. D.)  Dr. Navasartian's June 3, 2015 Dental Progress notes indicate, that in his exam, he noted inmate Elias had "erythema," the area around teeth #29 and #30 was "slightly endematous," his gingiva had "BOP" (Bleeding On Probing), and he had pain on probing.  (Navasartian Decl. at ¶11 & Ex. D.)  Dr. Navasartian provided inmate Elias with oral salt rinse to reduce gingival inflammation. (Navasartian Decl. at ¶12 & Ex. D; Milnes Decl. at ¶7 & Ex. D.)

An oral salt rinse may be recommended by the dentist based on subjective and objective findings and, in Dr. Navasartian's experience, may be beneficial in reducing gingival inflammation, enhancing wound healing, and reducing bleeding.  (Navasartian Decl. at ¶12.)

Dr. Navasartian also noted the gingival condition was a result of inmate Elias' "aggressive jamming of the tooth pick." (Navasartian Decl. at ¶13 & Ex. D; Milnes Decl. at ¶7 & Ex. D.) When a patient aggressively toothpicks his/her teeth, damage to the oral tissues may occur, which can include gingival recession, loss of bone or tooth structure, and interproximal gingival lacerations. (Navasartian Decl. at ¶13.)

Inmate Elias responded to Dr. Navasartian's findings by becoming agitated and stating, "You Mother Fucker did this to me." At that point, custody staff was contacted to have inmate Elias removed from the dental clinic for his uncooperative, aggressive, and disrespectful behavior. It is common practice that when an inmate becomes combative, either verbally or physically, they are removed from the dental clinic by custody staff. (Navasartian Decl. at ¶14 & Ex. D; Milnes Decl. at ¶7 & Ex. D.)

As a Doctor of Dental Science, Dr. Navasartian is authorized to prescribe pain management medication to patients. There is, however, no policy for when medication must be prescribed. Generally speaking, a determination of the need for pain medication is determined by subjective and objective findings. In inmate Elias' case, the Dental Pain Profile he had prepared on June 3, 2015, indicated that his pain was being relieved/lessened by "taking 6 naproxen 2 motrin." Thus, Dr. Navasartian did not prescribe any pain management medication to inmate Elias at that time because he was already taking Naproxen and Motrin which was affording him relief such that it was not necessary to prescribe Elias any other pain medication at that time. (Navasartian Decl. at ¶15 & Ex. D.)

On June 15, 2015, inmate Elias presented to the dental clinic for a face-to-face triage with Dr. Dubiel. Inmate Elias reported a chief concern of, "Where my fillings were last done food packs in when I eat and it hurts bad." Dr. Dubiel did a limited exam, reviewed inmate Elias' health questionnaire, and reviewed radiographs. Dr. Dubiel assessed/confirmed a diagnosis of open contact between teeth #29 and #30. Dr. Dubiel performed a new restoration to Tooth #30 to address the open contact, he checked for occlusion and contact, and post-procedure instructions were given. (Navasartian Decl. at ¶16 & Ex. F; Milnes Decl. at ¶8 & Ex. E.) On July 1, 2015, inmate Elias presented to the dental clinic for a 602 appeal interview

with Dr. Hensley. As documented in the treatment note, inmate Elias stated, "Doing fine now but would like an x-ray." Dr. Hensley noted further that, "#29-#30 – look fine tight contacts, medium size filling – not high." (Navasartian Decl. at ¶17 & Ex. G; Milnes Decl. at ¶9 & Ex. F.) Radiographs taken by Dr. Dubiel on June 1, 2015, demonstrated an open contact between teeth #29 and #30 that required one of the newly placed restorations performed by Dr. Navasartian to be replaced in order to close the contact. Additionally, a clinical evaluation performed by Dr. Dubiel that same day noted the occlusal contact of the restorations performed by Dr. Navasartian on May 26, 2015, was "high," requiring adjustment to eliminate excessive loading on the tooth. (Milnes Decl. at ¶10.)

The fact that occlusion and open contact were later observed is not uncommon for restorations. (Navasartian Decl. at ¶18.) Complications from a restoration, including open contacts and "high" occlusion, may occur by no fault of the treating dentist. An open contact may occur as a result of fracture to the filling material after placement. It can also occur as a result of procedural requirements such as placement of a wood wedge to have a flush surface of restorative material with tooth margin. (Navasartian Decl. at ¶18; Milnes Decl. at ¶11.) "High" occlusion requiring adjustment may result from changes in mandibular posture that occur from prolonged opening of the mouth during the restoration procedure. Additionally, the anesthesia administered during the dental procedure may mask subtle variations in the height of the filling which can be detected by the patient only after the anesthesia has worn off. Adjustment to the occlusion may not appear to be indicated until a period of time after the restoration appointment is completed. (Navasartian Decl. at ¶18; Milnes Decl. at ¶11.)

The restorations on teeth #29 and #30 performed by Dr. Navasartian, as documented in the treatment note dated May, 26, 2015, were within the standard of care. (Milnes Decl. at ¶10.) While open contact and occlusion can occur from the dentist's placement of the filling, in this case, there is nothing in Dr. Navasartian's treatment record that would indicate the fillings were placed in a manner that was below the standard of care. (Milnes Decl. at ¶11.) At all times that Dr. Navasartian provided dental care to inmate Elias, he never disregarded any condition with which he presented and never intended to cause him to have pain or be harmed. (Navasartian

Decl. at ¶19.) At no time after inmate Elias was removed from the dental clinic at the end of the June 3, 2015 appointment because of his behavior did Dr. Navasartian refuse to see inmate Elias as a patient, nor did he instruct anyone that he would not treat inmate Elias. (Navasartian Decl. at ¶20.)

## VI. DEFENDANT'S MOTION

Defendant, Dr. Navasartian, moves the court for summary judgment on the grounds that he was not negligent in the dental care he provided to Plaintiff, and was not deliberately indifferent to Plaintiff's dental needs. Defendant submits as evidence his own declaration, the declaration of Matthew Milnes (D.D.S.), Plaintiff's Complaint,[4] and Plaintiff's dental records.

### **Professional Negligence – Malpractice**

Defendant argues that he was not professionally negligent, because his conduct in treating Plaintiff was always within the community standard of care. Defendant argues that he is entitled to summary judgment regarding Plaintiff's negligence claims against him because Plaintiff has no expert evidence demonstrating defendant breached his professional duties to plaintiff or caused plaintiff's injuries.

Plaintiff's malpractice claim centers on the way Dr. Navasartian filled Plaintiff's teeth #29 and #30 on May 26, 2015. (Compl. at ¶13.) To establish the applicable standard of care, Defendant proffers the expert testimony of Dr. Matthew Milnes, a D.D.S. who is licensed to practice dentistry in California since September 2003. (Milnes Decl. at ¶1.) Dr. Milnes declares:

> "The restorations on teeth #29 and #30 performed by Dr. Navasartian, as documented in the treatment note dated May, 26, 2015, were within the standard of care." (Milnes Decl. at ¶10.) The fact that a few days later, Dr. Dubiel made an adjustment to the fillings because they were a bit high, or that an open contact was subsequently noted, is not uncommon, and thus, not indicative of malpractice. (Id. ¶11.) Indeed, complications from a restoration, including open contacts and "high" occlusion, may occur by no fault of the treating dentist. (Id.) An open contact may occur as a result of fracture to the filling material after

---

[4] Plaintiff's Complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence. Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004).

11

placement. (Id.) When Dr. Navasartian saw Elias on June 3, 2015, he noted that Elias' gingival condition was a result of Elias aggressively jamming a toothpick in the gingiva around the two teeth at issue. (Id. & Exh. D.)

Moreover, "high" occlusion requiring adjustment may result from changes in mandibular posture that occur from prolonged opening of the mouth during the restoration procedure. (Id. ¶11.) Additionally, the anesthesia administered during the dental procedure may mask subtle variations in the height of the filling which can be detected by the patient only after the anesthesia has worn off. (Id.) Adjustment to the occlusion may not appear to be indicated until a period of time after the restoration appointment is completed. (Id.)

Accordingly, while open contact and occlusion can occur from the dentist's placement of the filling, in this case, as Dr. Milnes opines, there is nothing in Dr. Navasartian's treatment record that would indicate the fillings were placed in a manner that was below the standard of care. (Id.)

Defendant argues that the issue of his negligence in the care and treatment of Plaintiff is properly resolved on summary judgment since expert opinion establishes a complete defense and the absence of an element essential to Plaintiff's case.

### Deliberate Indifference – Eighth Amendment

Defendant argues that he did not violate Plaintiff's Eighth Amendment rights, because Plaintiff's condition was not serious and Defendant was not deliberately indifferent to Plaintiff's dental needs.

### Serious Medical Need

Defendant argues that it is debatable whether Plaintiff's condition was serious. Defendant asserts that after he filled Plaintiff's teeth #29 and #20, he checked for occlusion and contact, finding none. (Navarsartian Decl. at ¶9.) Defendant contends that because six days later Dr. Dubiel simply had to grind down the fillings a bit, and subsequently corrected the contact that had appeared, these conditions do not inherently amount to a serious condition because they commonly occur with restorations. (Id. ¶18.) Defendant argues that this is especially true given Elias aggressively toothpicked his gingiva and had poor dental hygiene (not flossing).

Defendant cites Hunt as a case that stands in stark contrast. Hunt v. Dental Dept., 865 F.2d 198 (9th Cir. 1989). In Hunt, the plaintiff lost his top and bottom dentures that he wore to compensate for thirteen missing teeth. The plaintiff alleged that as a result of the prison's delay in responding to his condition, his gums were bleeding and infected, he suffered substantial

pain, and he lost weight because he was unable to eat properly.  (Id. at 199.)  The Ninth Circuit found that his condition could be sufficient to satisfy a "serious" dental need. (Id. at 201.)  By comparison, Plaintiff Navasartian had two fillings on May 26, he requested to be seen on June 1, an occlusion was noticed by Dr. Dubiel and it was simply ground down on the same day as his request.  (See ECF No. 1-1 at p. 6; Navarsartian Decl. at ¶8 & Exh. C.)  Dr. Dubiel also diagnosed an open contact between the teeth which was corrected on June 15.  Defendant argues that within a matter of twenty days, what were commonly occurring conditions from restorations, complicated by Elias' poor dental hygiene and aggressive toothpicking that caused periodontitis and gingivitis, were corrected, leaving Elias fine.

Defendant argues that even if it is assumed that Plaintiff had a serious dental condition, Plaintiff has no evidence that Defendant was deliberately indifferent, because the undisputed facts show that Plaintiff received prompt and constitutionally appropriate dental care.

## **Deliberate Indifference**

Defendant argues that he was not deliberately indifferent, based on the conduct attributed to him by Plaintiff in the Complaint: that he failed to prescribe Plaintiff any pain medication on June 3, 2015 and the only treatment provided was a salt rinse; that he told Plaintiff the complications were caused by Plaintiff's failure to floss but instead recorded that the complications were caused by Plaintiff aggressively toothpicking his teeth; that he authored a document that falsely claimed Plaintiff refused dental treatment on June 3, 2015;  and that on June 4, 2015, Plaintiff was told that Dr. Navasartian did not want to see him and Plaintiff would have to wait at least a week to see another dentist.  (Compl. ¶¶24-34.)

Defendant first argues that Plaintiff cannot establish even a negligence or malpractice claim against Defendant because of expert testimony that the dental care he provided was within the standard of care.  Defendant cites Colwell v. Bannister, 743 F.3d 1060, 1066 (9th Cir. 2014) (Deliberate indifference "requires more than ordinary lack of due care") in support of his contention that that where there is not even a lack of due care, Plaintiff cannot then satisfy the higher threshold necessary for his claim of deliberate indifference.

///

Next Defendant argues that he was not deliberately indifferent when he decided not to prescribe pain medication for Plaintiff, because in making the decision he took into consideration how Plaintiff reported his pain and the fact that Plaintiff was already "taking 6 naproxen 2 motrin" for pain. (Navasartian Decl. ¶15 & Exh. D.) Defendant declares:

> Inmate Elias has alleged in this case that I was deliberately indifferent to him on June 3, 2015, because I failed to prescribe him any pain medication. As a Doctor of Dental Science, I am authorized to prescribe pain management medication to patients. There is, however no policy for when medication must be prescribed for pain management. Generally speaking, a determination of the need for pain medication is determined by subjective and objective findings. In inmate Elias' case, on June 3, 2015, the Dental Pain Profile he had prepared indicated that his pain was being relieved/lessened by "taking 6 naproxen 2 motrin." (Ex. D.) Thus, inmate Elias was already on medication that was affording him pain relief such that it was not necessary for me to prescribe any other pain medication at that time.

(Id.) Defendant asserts that he did not disregard Plaintiff's report of pain – he considered it along with Plaintiff's own report that he was already taking pain medication.

As for Plaintiff's claim that Defendant providing an oral salt rinse was deliberately indifferent, Defendant argues that this is a difference of opinion between the prisoner and doctor, which does not give rise to a § 1983 action. Defendant asserts that when he saw Plaintiff on June 3, he "performed an examination, reviewed radiographs, reviewed patient summary, and diagnosed moderate localized periodontitis [which is] defined as inflammation of the gingiva, loss of interproximal bone, and supporting structures to the tooth extending into the adjacent attachment apparatus. "(Navasartian Decl. ¶10 & Exh. D.) He also "diagnosed gingivitis [which is] inflammation limited to the free and attached gingiva." (Id.) In the exam, Defendant "noted Elias had 'erythema,' that the area around teeth #29 and #30 was 'slightly endematous,' and found that Plaintiff's "gingiva had 'BOP' (Bleeding On Probing), and he had pain on probing." (Id. ¶11.) These are all indicia of periodontitis and gingivitis. (Id. ¶10 & Exh. D.) He provided Plaintiff with oral salt rinse, as recommended by dentists, because it proves beneficial in reducing gingival inflammation, enhancing wound healing, and reducing bleeding—conditions which Defendant observed in Plaintiff's case. (Id. ¶12 & Exh. D.)

Defendant argues that telling Plaintiff his gingival condition was from not flossing, but not recording it in the treatment note, is not an act of deliberate indifference. Defendant also

argues that his act of including in a treatment note that Plaintiff's gingival condition was the result of Plaintiff aggressively jamming a toothpick around teeth #29 and #30 is not an act of deliberate indifference.

Defendant denies that he authored a false document that said Plaintiff refused dental treatment on June 3, 2015. Defendant gives this account: "Inmate Elias responded to [Defendant's finding about excessive toothpicking] by becoming agitated and stating, 'You Mother Fucker did this to me,' [and a]t that point, custody staff was contacted to have inmate Elias removed from the dental clinic for his uncooperative, aggressive, and disrespectful behavior." (Id. at ¶14, Exh. E.) Defendant argues that his termination of further dental treatment that day was not deliberately indifferent, but was authorized and a measured response to Elias' conduct.

As for Plaintiff's claim that he was told by a dental assistant that Defendant instructed that person that he would not treat Plaintiff, Defendant asserts that this is not true, and Plaintiff's claim is based on inadmissible hearsay. Defendant declares that "[a]t no time after inmate Elias was removed at the end of the June 3, 2015 appointment because of his behavior did I refuse to see inmate Elias as a patient, nor did I instruct anyone that I would not treat inmate Elias."

Finally, Defendant argues that any delay in Plaintiff's treatment did not result in further harm. Defendant asserts that it is clear from the record that Plaintiff received prompt treatment and that the occlusion was adjusted on June 1 to where Elias "felt better," and the open contact was resolved on June 15. (Navasartian Decl. ¶¶8, 16.) By July 1, Elias was "doing fine." (Id. ¶17 & Exh. G.) Defendant asserts that Plaintiff only suffered a brief period of discomfort, and Plaintiff informed Dr. Navasartian that the pain was lessened by his taking Naproxen and Motrin. Defendant asserts that even assuming there was a delay in treatment, Plaintiff has not alleged any harm. Defendant argues that Plaintiff has failed to raise a question as to whether Defendant had a "sufficiently culpable state of mind."

Based on Defendant's arguments and evidence in support of his motion for summary judgment, the court finds that Defendant has met his burden of setting forth evidence that there

is no genuine issue of material fact for trial, which shifts the burden to Plaintiff to submit admissible evidence showing the existence of genuine issues for trial.

## VII.  PLAINTIFF'S RESPONSE TO DEFENDANT'S UNDISPUTED FACTS

Plaintiff indicates that he agrees with all except four of Defendant's Undisputed Facts, to which Plaintiff offers the following:

<u>DUF 18</u>:  Dr. Navasartian's June 3, 2015 Dental Progress notes indicate, that in his exam, he noted inmate Elias had "erythema," the area around teeth #29 and #30 was "slightly endematous," his gingiva had "BOP" (Bleeding On Probing), and he had pain on probing. (Deft's Statement of Undisputed Facts, ECF No. 26-3 ¶18.)

  <u>Plaintiff</u>:  Denied. Dr. Navasartian's June 3, 2015 Dental Progress notes indicate, that in his exam, he noted inmate Elias had "gingival tissue [gums] with erythema [red, raised patches]. Slightly edematous [swollen] perie pocket > 6mm with BOP [Bleeding on Probing]. Pt. [Patient] experienced sever[e] pain [u]pon probing. (Pltf's Statement of Undisputed Facts, ECF No. 30 at ¶18.)

<u>DUF 34</u>:  At no time after inmate Elias was removed from the dental clinic at the end of the June 3, 2015 appointment because of his behavior did Dr. Navasartian refuse to see inmate Elias as a patient, nor did he instruct anyone that he would not treat inmate Elias. (Deft's Statement of Undisputed Facts, ECF No. 26-3 ¶34.)

  <u>Plaintiff</u>:  Plaintiff disputes this fact. Plaintiff asserts that he received via institutional mail a CDC 128-C Dental Chrono authored and signed by Defendant Navasartian, dated June 3, 2015. (Elias Decl. at ¶5 and Attachment 1.) Additionally, in response to Plaintiff's interrogatories, set one, no. 1, Defendant Navasartian stated, "[o]n June 3, 2015, Defendant advised [Dental Assistant C.] Lebo that because Plaintiff was uncooperative and disrespectful, treatment of the day was being discontinued." (Pltf's Statement of Undisputed Facts, ECF No. 30 at ¶34.)

<u>DUF 24</u>:  As a Doctor of Dental Science, Dr. Navasartian is authorized to prescribe pain management medication to patients. There is, however, no policy for when medication must be prescribed. Generally speaking, a determination of the need for pain medication is determined by subjective and objective findings. In inmate Elias' case, the Dental Pain Profile he had prepared on June 3, 2015, indicated that his pain was being relieved/lessened by "taking 6 naproxen 2 motrin." Thus, Dr. Navasartian did not prescribe any pain management medication to inmate Elias at that time because he was already taking Naproxen and Motrin which was affording him relief such that it was not necessary to prescribe Elias any other pain medication at that time. (Deft's Statement of Undisputed Facts, ECF No. 26-3 ¶24.)

  <u>Plaintiff</u>:  Admitted in part, and denied in part. Plaintiff admits that, as a Doctor of Dental Science, Dr. Navasartian is authorized to

prescribe pain management medication to patients. There is however, no policy for when medication must be prescribed. Generally speaking, a determination of the need for pain medication is determined by subjective and objective findings. In inmate Elias' case, the Dental Pain Profile he had prepared on June 3, 2015, indicated that his pain was being relieved/lessened by "taking 6 naproxen 2 motrin."

Plaintiff disputes Defendant's statement that, Thus, Dr. Navasartian did not prescribe any pain management medication to inmate Elias at that time because he was already taking Naproxen and Motrin which was affording him relief such that it was not necessary to prescribe Elias any other pain medication at that time. (Elias Decl. ¶3 & DUF Exh. D.) The Dental Pain Profile (DUF Exh. D) does not indicate that Plaintiff "was already taking Naproxen and Motrin." Id.
(Pltf's Statement of Undisputed Facts, ECF No. 30 at ¶24.)

DUF 33:        At all times that Dr. Navasartian provided dental care to inmate Elias, he never disregarded any condition with which he presented and never intended to cause him to have pain or be harmed. (Deft's Statement of Undisputed Facts, ECF No. 26-3 ¶33.)

Plaintiff:        Plaintiff disputes this fact. Plaintiff asserts that on June 3, 2015, he represented to defendant Navasartian that as a direct result of the dental treatment he provided on May 26, 2015, Plaintiff was suffering the unbearable, aching, pounding, shooting, sore, stabbing and throbbing pain in around the teeth in his lower right mandibular region that radiated throughout his head for over a week. Plaintiff also asserts that when informed of such pain, Defendant Navasartian failed to respond reasonably by taking measures to abate such severe pain. (Pltf's Statement of Undisputed Facts, ECF No. 30 at ¶33.)

## IX.        PLAINTIFF'S LIST OF DISPUTED FACTS

1.        On May 26, 2015, during Navasartian's examination, he did not note any edema, erythema, or gingivitis. (Elias Decl. ¶7 and Attachment 6.)

2.        On June 1, 2015, Plaintiff submitted a Dental Request stating, "got lots of sharp pain on my teeth bad headache." (Elias Decl. ¶8 and Attachment 7.)

3.        Later, on June 1, 2015, Plaintiff submitted another Dental Request stating that Dubiel's treatment "didn't take the pain away." (Elias Dec. ¶9 and attachment 8.)

4.        Not being contacted by medical staff and suffering severe pain and headaches, on June 2, 2015, Plaintiff submitted another Dental Request, stating that he has

"really bad pain," his "gums hurt," and had a "headache over a week." (Elias Decl. ¶10 and attachment 9.)

5.    On June 3, 2015, Defendant Navasartian examined Plaintiff and actually documented, "Pt [Patient] experienced sever[e] pain [u[pon probing." Despite such findings, Defendant Navasartian did not provide any pain medication to Plaintiff. (Elias Decl. ¶11 and Attachment 10.)

6.    Defendant Navasartian attributes Plaintiff's gingival condition to the "aggressive jamming of toothpick." (Navasartian Decl. ¶13 & Exh. D.) However, Plaintiff has never utilized a toothpick on his teeth or gums. Rather, Plaintiff only uses floss, and informed Dubiel on June 1, 2015, that "eating" and "flossing" makes the pain worse. (Elias Decl. ¶12 and Attachment 11.)

## X.   PLAINTIFF'S OPPOSITION

Plaintiff opposes Defendant Navasartian's motion for summary judgment, arguing that Defendant Navasartian was negligent and deliberately indifferent in treating Plaintiff's teeth. Plaintiff submits as evidence Defendant's Undisputed Facts, which he does not dispute (except for DUF 11, 15, 19 and 20, as discussed above) and which cite to the declarations of Defendant Navasartian and Matthew Milnes (D.D.S.), Plaintiff's Complaint, and Plaintiff's dental records. Plaintiff also submits his own disputed facts, which cite to his own declaration, Defendant's response to Plaintiff's Interrogatory, set one, no. 1, and Plaintiff's dental records.

Plaintiff claims that there is a dispute as to whether Defendant Navasartian undertook measures to abate Plaintiff's severe pain or understood that he had an obligation to do so.

Plaintiff argues that he had severe pain and Defendant Navasartian knew about it because he reviewed Plaintiff's Dental Pain Profile wherein Plaintiff checked boxes that described his pain as "aching, pounding, tender, shooting, throbbing, sore, and stabbing." (Navasartian Declaration, ECF No. 26-4 ¶9; Defendant's Exh. D, ECF No. 26-4 at 14.) Navasartian declares that he met with Plaintiff on June 3, 2015 and reviewed Plaintiff's Dental Pain Profile. (Id.) Exhibit D is Plaintiff's Dental Pain Profile dated June 3, 2015, and signed by Defendant Navasartian, wherein Plaintiff reports unbearable pain and headache for more

than a week, affecting his ability to eat and drink, and reports that he is taking 6 naproxen and 2 motrin, which relieves or lessens the pain. (ECF No. 26-4 at 14.) Plaintiff also asserts that he explicitly reported to Navasartian, "I have really bad pain, my gum hurts." (Navasartian Decl. ¶10.) Defendant declares, "Inmate Elias reported his chief concern of, 'I have really bad pain, my gum hurts,' referencing teeth #29 and #30." (Id.)

Plaintiff argues that defendant was deliberately indifferent because despite being authorized to prescribe pain medication to patients as a Doctor of Dental Science, Navasartian failed to abate Plaintiff's severe pain based on his "subjective and objective findings" that Plaintiff was already on medication that afforded pain relief. (Id. ¶15.) In ¶15 of his declaration, Defendant declares:

> Inmate Elias has alleged in this case that I was deliberately indifferent to him on June 3, 2015, because I failed to prescribe him any pain medication. As a Doctor of Dental Science, I am authorized to prescribe pain management medication to patients. There is, however no policy for when medication must be prescribed for pain management. Generally speaking, a determination of the need for pain medication is determined by subjective and objective findings. In inmate Elias' case, on June 3, 2015, the Dental Pain Profile he had prepared indicated that his pain was being relieved/lessened by "taking 6 naproxen 2 motrin." (Ex. D.) Thus, inmate Elias was already on medication that was affording him pain relief such that it was not necessary for me to prescribe any other pain medication at that time.

(Id.)

Plaintiff contends that Navasartian was obligated under CDCR policy to review the inmate-patient's health history prior to each treatment. (Defendant's Exh. E, ECF No. 26-4 at 16.) Exhibit E is Plaintiff's dental record (Supplemental Dental Progress Notes) dated June 3, 2015, and signed by Dr. Navasartian, which states at the top of the page, "Prior to each treatment, the clinician *must* review the Inmate-patient's health history, note changes or specify no change." (Id.) (emphasis in original). Plaintiff claims that a cursory review of his health history reveals that as of June 3, 2015, he was not under a current prescription for any pain medication. (ECF No. 30 at 36, Attachment 12.) Attachment 12 is Plaintiff's medical record titled "Medication Reconciliation – Inactive Medications as of 6/30/15," showing that four of Plaintiff's medications had not been renewed. (Id.)

///

Plaintiff argues that as a result of defendant Navasartian's failure to mitigate his severe pain, he was unable to engage in normal daily activities, e.g., eating and drinking, due to his unbearable dental pain. (Defendant's Exh. D, ECF No. 26-4 at 14; Plaintiff's Attachment 11, ECF No. 30 at 35.) Defendant's Exhibit D is Plaintiff's June 3, 2015 Dental Pain Profile discussed above, and Plaintiff's Attachment 11 is Plaintiff's Dental Pain Profile dated June 1, 2015 and signed by Dr. Dubiel, wherein Plaintiff reports very bad and intense pain and headache for more than a week and reports that eating and flossing makes the pain worse. (Id.)

## VII. DISCUSSION

### A. Eighth Amendment Claim

The court finds no genuine issue of material fact for trial. Plaintiff has shown that he had "a serious medical need" and that Defendant knew about the need, but has not shown that Defendant acted with deliberate indifference.

Plaintiff has shown that he reported to more than one dentist that he was suffering intense tooth pain and headache which affected his ability to eat and drink. The court finds that such pain "could result in the unnecessary and wanton infliction of pain" without treatment, satisfying the legal standard for a "serious medical need." There is no dispute that Plaintiff presented to Dr. Navasartian on June 3, 2016, complaining of pain in his teeth #29 and 30, the same two teeth that had been filled by Navasartian on May 26, 2015. Therefore, Defendant knew Plaintiff was suffering tooth pain when he saw Defendant for dental treatment.

However, Plaintiff's evidence fails to show that Dr. Navasartian's response to his pain was "deliberately indifferent." Plaintiff argues that Defendant was deliberately indifferent as shown by the following conduct:

(1)     Defendant failed to prescribe pain medication for Plaintiff's severe pain and only dispensed salt as treatment.

(2)     Defendant falsely reported that Plaintiff refused dental treatment on June 3, 2015, when Plaintiff never refused treatment.

///

(3)     Defendant told Plaintiff that his tooth pain and bleeding was the result of Plaintiff not flossing his teeth and aggressively using a toothpick, when Plaintiff had been regularly flossing and had never used a toothpick on his teeth while in prison.

Even if Plaintiff's allegations of Defendant's conduct were true, Plaintiff has not shown that Defendant acted with deliberate indifference. None of Plaintiff's evidence shows that Defendant was consciously aware that a substantial risk of serious harm to Plaintiff's health existed, yet purposely failed to properly respond to Plaintiff's pain. Plaintiff shows no evidence that Defendant possessed the requisite state of mind.

To the extent that Plaintiff's claim against Defendant arises out of Plaintiff's disagreement with the doctor's course of treatment, Plaintiff's claim fails. As discussed above, a mere difference of opinion between Plaintiff and Defendant regarding medical treatment does not give rise to a claim under section 1983 unless Plaintiff shows that the course of treatment chosen was medically unacceptable under the circumstances and that it was chosen in conscious disregard of an excessive risk to Plaintiff's health. Plaintiff has not made this showing. Plaintiff offers no evidence except his own opinion that the treatment was medically unacceptable under the circumstances, and as a lay witness, Plaintiff is not qualified to render an opinion that Defendant should have considered other treatments, or that Defendant's failure to do so was in contravention of acceptable medical standards. Fed. R. Evid. 701, 702. Moreover, Plaintiff has not disputed Defendant's assertions that he followed the appropriate steps, as understood by Defendant, to fill Plaintiff's teeth, examine Plaintiff, review records, and diagnose him. (Navasartian's Decl., ECF No. 26-4 ¶¶7, 10.) Based on this evidence, the court finds that Plaintiff cannot succeed on his federal claim against Defendant, and summary judgment should be granted.

///

## B. **Professional Negligence**

The court also finds that Plaintiff cannot succeed on his professional negligence claim against Defendant, because Plaintiff has not shown that Defendant breached his duty to follow the standards of care possessed and exercised by other dentists in the community.

Defendant has submitted the declaration of expert witness Dr. Milnes regarding the standard of care issue. As for his qualifications, Dr. Milnes declares:

> I am a Doctor of Dental Surgery (D.D.S.), licensed in the State of California, license #51620. I received my training and degree from University of the Pacific, School of Dentistry and have been licensed in the State of California to practice dentistry since September, 2003. I am currently employed by the California Department of Corrections and Rehabilitation (CDCR), Division of Health Care Services (DCHCS), Inmate Dental Services Program (IDSP), as the Regional Dental Director of Region III. I have been employed in this capacity since June 27, 2011. As the Regional Dental Director, I am responsible for clinical operations and policy compliance. Prior to assuming the position of Regional Dental Director, I have served in the capacity of staff dentist, CF on the program support team (PST), Region II and at Deuel Vocational Institution (DVI). Prior to state service I practiced dentistry privately for 7 years.

The court finds that based on his declaration, Dr. Milnes is qualified as an expert to discuss the standard of care for filling teeth followed by dentists in the community.[5]

Plaintiff offers no evidence except his own opinion, and Plaintiff is not qualified to render an opinion that Defendant should have considered other treatments. Plaintiff has not contested Dr. Milnes' credentials as an expert witness or the adequacy of his reviews of the evidence in this case.

Plaintiff has not presented the required expert testimony contesting Defendant's evidence that Defendant followed the community standards of care when treating Plaintiff. "[W]here the conduct required of a medical professional is not within the common knowledge of laymen, a plaintiff must present expert witness testimony to prove a breach of the standard

---

[5] Under Federal Rules of Evidence 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

of care." <u>Bushling v. Fremont Med. Ctr.</u>, 11 Cal. Rptr. 3d 653, 664 (2004).  Therefore, Plaintiff fails to succeed on his negligence claim.

## IX. CONCLUSION AND RECOMMENDATION

The court finds no genuine dispute of material fact to preclude summary judgment.  The record demonstrates that Plaintiff's complaints about his tooth pain were appropriately addressed by Defendant.  Plaintiff's mere disagreement with the course of treatment chosen by Defendant does not support a claim under the Eighth Amendment, and Defendant is entitled to summary judgment.  Accordingly, Defendant is entitled to judgment on Plaintiff's claims against him, and Defendant's motion for summary judgment, filed on July 6, 2016, should be granted.

Therefore, based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.     Defendant Navasartian's motion for summary judgment under Rule 56, filed on December 13, 2016, be GRANTED; and

2.     Summary judgment be entered in favor of Defendant Navasartian on Plaintiff's claims against him in this case.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after the date of service of these Findings and Recommendations, any party may file written objections with the court.  The document should be captioned "Objections to

///
///
///
///
///
///
///
///
///

Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days of the date the objections are filed. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**May 4, 2017**__          _____**/s/ Gary S. Austin**
                                   UNITED STATES MAGISTRATE JUDGE